UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JERRY STOCKDALL, et al., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:14CV01557 ERW |
| | ) |
| TG INVESTMENTS, INC., et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This matter comes before the Court after a non-jury trial to address the claims asserted by Plaintiffs Jerry Stockdall and Christina Stockdall in their Amended Complaint [ECF No. 13]. A one-day bench trial on these matters was held before this Court on January 11, 2016. The Court makes the following findings of fact and conclusions of law. Fed. R. Civ. P. 52(a).

**I.  FINDINGS OF FACT**

Plaintiffs Jerry Stockdall and Christina Stockdall ("Plaintiffs") bring this suit under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*., and the Missouri Minimum Wage Law ("MMWL"), Mo. Rev. Stat. § 290.505, *et seq*. against Defendants TGI Investments, Inc. and George Shipman ("Defendants"). Plaintiffs are Missouri residents who worked for Defendants at the Chateau Inn and Suites in Cuba, Missouri. Defendants are the owners of the Chateau Inn and Suites and Plaintiffs' employer. Jurisdiction and venue are proper.

Plaintiffs allege Defendants failed to pay Ms. Stockdall regular wages and Defendants failed to pay both Mr. and Ms. Stockdall for overtime wages. Plaintiffs seek an award of lost regular wages for Ms. Stockdall, lost overtime wages for Mr. and Ms. Stockdall, and liquidated

1

damages. Plaintiffs also allege Defendants retaliated against Plaintiffs for filing this lawsuit by asserting baseless counterclaims against Plaintiffs. Plaintiffs asserted five counts against Defendants: (I) Violation of the FLSA and MMWL through Christina Stockdall, (II) Violation of the FLSA and MMWL through Jerry Stockdall, (III) Slander/Defamation, (IV) Conversion, and (V) FLSA Retaliation. Plaintiffs voluntarily dismissed Counts III and IV. In its Memorandum and Order on summary judgment, the Court determined Ms. Stockdall was an employee of Defendants and was owed wages for the hours in which she worked, Ms. Stockdall was owed overtime wages for any hours over forty for which she worked each week, and Mr. Stockdall was owed overtime wages for any hours over forty for which he worked each week. The Court also determined Plaintiffs were entitled to liquidated damages as Defendants did not qualify for the exception. The Court did not determine the amounts of damages Plaintiffs were owed.

At the one-day bench trial on this matter, Plaintiffs presented their case-in-chief by calling two witnesses, Christina and Jerry Stockdall. Defendants did not call any witnesses or present any evidence. Plaintiffs introduced several documents into evidence. The Court makes the following findings of fact based on the evidence presented and the reasonable inferences derived therefrom.

    A.    Testimony of Cristina Stockdall

Cristina Stockdall is married to Jerry Stockdall. Trial Tr. 10:1-4. Ms. Stockdall heard about the Chateau Inn and Suites was hiring live-in managers in April 2013 when she was on her honeymoon anniversary. Trial Tr. 10:5-9. Ms. Stockdall and Mr. Stockdall applied for the position and were interviewed by George Shipman. Trial Tr. 10:11-16. Mr. and Ms. Stockdall were hired on the same day of the interview and were told to gather their belongings and move in to the motel to start working as live-in managers. Trial Tr. 11:1-6. They were told they would be

paid $700, every two weeks, by a check in Mr. Stockdall's name. Trial Tr. 11:7-12. The Stockdalls moved in to the motel on May 3, 2013. Trial Tr. 11:16-17. The Stockdalls were trained by Dana Rodrigues for four days. Trial Tr. 11:1-12:3. After Ms. Rodriguez trained the Stockdalls, Mr. and Ms. Stockdall were left in charge of running the Chateau's day-to-day operations. Trial Tr. 12:19-21.

      Mr. and Ms. Stockdall had individual job duties. Trial Tr. 12:22-24. Ms. Stockdall woke up around 5:00 each morning to prepare and set out breakfast by 6:00 a.m. Trial Tr. 13:5-6. After preparing breakfast, Ms. Stockdall filled out sales reports, determined which rooms had been rented, and filled out maid reports, while making sure the coffee was fresh and the breakfast remained stocked for guests. Trial Tr. 7-16. While Ms. Stockdall was preparing breakfast, she carried a phone with her, so if a guest arrived at the front desk, she would be able to provide assistance. Trial Tr. 14:3-24. These duties would take until approximately 9:00 a.m. each day. Trial Tr. 15:4-6. After finishing breakfast and her morning paperwork, Ms. Stockdall would assign the housekeepers rooms to be cleaned and would check guests out of the motel. Trial Tr. 15:8-17. From checkout at 11:00 a.m. to 11:00 p.m., Ms. Stockdall would manage the front desk, check the rooms the maids had cleaned, check in with the office, George Shipman or Tina Shipman, about any questions regarding paperwork and answer any phone calls from guests. Trial Tr. 15:20-16:13.

      At 11:00 p.m., the Stockdalls would lock the doors, put a phone in the foyer and a phone on the front desk with signs instructing guests to hit zero on the phone if they needed assistance for towels, new room keys, or other miscellaneous needs. Trial Tr. 16:15-22. Throughout the night, the Stockdalls received between five and ten calls a night, on average, from guests. Trial Tr. 17:10-16. The Stockdalls were trained to keep the lobby open from 7:00 a.m. to 11:00 p.m.

and then to put a sign next to the phone should someone need assistance. Trial Tr. 18:6-8. They would take turns answering calls throughout the night and respond to guest inquiries. Trial Tr. 18:9-12. There were nights where both Mr. and Ms. Stockdall would need to assist guests at the same time. Trial Tr. 13-17.

This was the Stockdalls' routine every week for the entire time they worked at the Chateau. Trial Tr. 18:18-24. Every week, Ms. Stockdall was given twenty-four hours off in six to eight hour increments. Trial Tr. 18:25-19:5. Mr. and Ms. Stockdall were required to supervise the front desk for all remaining hours. Trial Tr. 19:16-23. Mr. and Ms. Stockdall were not permitted to leave the property at the same time unless there was a relief manager on the property. Trial Tr. 19:25-20:3. There were only two times throughout their time working at the Chateau where they left the property for more than five hours. Trial Tr. 20:4-8.

Mr. and Ms. Stockdall were in charge of administering payroll for Chateau employees. Trial Tr. 20:14-16. Payroll consisted of calculating the amount of rooms cleaned by housekeepers and the amount of hours the laundry person had been at the motel. Trial Tr. 20:17-20. Payroll was completed every two weeks. Trial Tr. 20:21-22. The payroll only included hours for Ms. Stockdall in which she worked as a housekeeper or did laundry; it did not include any hours for her time working as a manager. Trial Tr. 21:1-9. With Mr. Shipman's permission, Ms. Stockdall was periodically paid for laundry or housekeeping work when one of the employees was unable to work. Trial Tr. 24:13-25:7. Ms. Stockdall was paid a total of $894.01. Trial Ex. P-15. Ms. Stockdall received no other payment for her work at the Chateau. Trial Tr. 30:6-9.

Ms. Stockdall also filled out sales reports which reported the number of rooms rented each night. Trial Tr. 31:21-32:23. While Mr. and Ms. Stockdall worked at the motel, Ms. Stockdall's mother stayed at the motel three times without paying for the rooms. Trial Tr. 33:23-

4

25; 34:16-23. The daily rate for a motel room at the Chateau was $59.00 per night. Trial Tr. 35:1-3. The Stockdalls also allowed Tina Shedd and her husband to live in the motel for approximately 120 days without paying. Trial Tr. 35:4-18. The Stockdalls also allowed a friend of Mr. Stockdall to stay at the motel for two nights without paying for the rooms. Trial Tr. 35:22-36:2. Ms. Stockdall is willing to credit the damages awarded for the rooms she gave away without charge. Trial Tr. 38:10-13.

For every week Ms. Stockdall worked at the Chateau, she woke up at 5:00 a.m. to put out breakfast, she performed the managerial duties previously discussed, she monitored the front desk throughout the day, and she answered phone calls throughout the night. Trial Tr. 30:10-23. She worked six days a week, eighteen hours a day. Trial Tr. 30:24-31:1. Ms. Stockdall was terminated on January 3, 2014, at 2:00 p.m. Trial Tr. 31:2-7. Tina Shipman told the Stockdalls allowing Tina Shedd to stay at the motel without charge was theft and immediately terminated the Stockdall's employment. Trial Tr. 36:3-6.

    B.    Testimony of Jerry Stockdall

Jerry Stockdall is married to Cristina Stockdall. Mr. Stockdall moved into the Chateau and immediately started working as a manger on May 3, 2013. Trial Tr. 40:24-41:6. There was a four day training period with Dana Rodriguez which lasted all day and all night each day. Trial Tr. 41:23-42:2. After the training period, Mr. and Ms. Stockdall were in charge of the Chateau and had separate duties. Trial Tr. 42: 3-8.

The Stockdall's seven-year-old daughter lived at the Chateau with them. Trial Tr. 48:14-18. She attended school during the day and after school, she would sit in the room behind the office or in the extra room the Stockdalls occupied doing homework, watching TV, or coloring. Trial Tr. 48:19-49:2. She took the bus to and from school each day. Trial Tr. 49:6-9.

Mr. Stockdall's typical day started at 3:30 a.m. when he would do an outdoor security check to make sure doors were closed and there was no property damage in the parking lot. Trial Tr. 42:9-17. Then, Mr. Stockdall would start coffee for any guests checking out early and would help Ms. Stockdall prepare breakfast. Trial Tr. 42: 22-43:2. After breakfast, Mr. Stockdall took care of his pool, cleaned furniture and windows, replaced dirty towels with clean ones, took care of the patio, and took out the trash. Trial Tr. 43:10-14. Mr. Stockdall would then, attend to the lobby by dusting and sweeping, and check outside trash. Trial Tr. 43:18-21. Mr. Stockdall was also in charge of breaking down the breakfast bar. Trial Tr. 44:2-4. After breakfast, Mr. Stockdall's general custodial and maintenance tasks took three to four hours. Trial Tr. 44:5-10. For the remainder of the day, until 11:00 p.m., Mr. Stockdall checked in guests and helped with guest services. Trial Tr. 44:13-21. At 11:00 p.m., Mr. Stockdall retired to the Stockdall's room. Trial Tr. 44:22-23. In slower months, Mr. Stockdall retired to his room around 9:00 p.m. Trial Tr. 45:5-8.

After 11:00 p.m. each night, Mr. Stockdall, along with Ms. Stockdall, took a phone into their room which connected to the phone in the front lobby. Trial Tr. 45:20-46:14. Guests or potential guests were able to contact the Stockdalls throughout the night should they need assistance. Trial Tr. 46:10-17. On average, the Stockdalls received five to ten calls each night. Trial Tr. 46:21-24. Each week Mr. Stockdall had twenty-four hours off. Trial Tr. 47:10-13. One of the Stockdalls had to remain at the motel at all times unless there was someone else to watch the front desk. Trial Tr. 47:16-21. This was Mr. Stockdall's routine each week he worked at the Chateau. Trial Tr. 47:7-9. He was terminated on January 3, 2014, at approximately 2:00 p.m. Trial Tr. 48:3-6.

While Mr. Stockdall was still working for the Chateau, in December 2013, he started looking for a different job and signed up with an employment agency called Penmac. Trial Tr. 49:10-15. After interviewing and applying for the job, he attended an orientation which took approximately eight hours. Trial Tr. 49:20-50:5.

Mr. Stockdall testified he and Ms. Stockdall allowed Tina Shedd and her husband live in the motel for approximately 90 days without paying.[1] Trial Tr. 50:16-18. Mr. and Ms. Shedd took care of their own cleaning of the rooms and laundry. Trial Tr. 50:19-22. Ms. Shedd also worked for the motel doing laundry. Trial Tr. 50:23-51:3. The Stockdalls reported this room as vacant or down. Trial Tr. 51:10-14. When Lisa Simpson, Ms. Stockdall's mother, stayed in the motel, Mr. Stockdall or Ms. Stockdall cleaned the room. Trial Tr. 52:4-6.

After Mr. Stockdall was terminated he called Mr. Shipman and apologized for what Mr. Stockdall described as theft and told Mr. Shipman he wanted to make it right. Trial Tr. 52:9-14. A few days later, Mr. Stockdall told a police detective at the Cuba Police Department the same thing. Trial Tr. 52:15-17.

## II. CONCLUSIONS OF LAW

### A. *Wages Owed to Cristina Stockdall*

The FLSA and MMWL require employers to pay employees a minimum wage of $7.25 per hour. 29 U.S.C. § 206(a)(1)(c); Mo. Rev. Stat. § 290.502. A plaintiff pursuing claims under the FLSA must prove, by a preponderance of the evidence, she performed work for which she was not properly compensated. *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012). Pursuant to FLSA regulations promulgated by the United States Department of

---

[1] This is different than Ms. Stockdall's testimony Tina Shedd and her husband stayed in the motel for 120 days without paying.

Labor[2] ("DOL"), work "suffered or permitted," even if not requested by the employer, is work time for which the employee must be compensated if the employer knows or has reason to believe the employee is working. 29 C.F.R. § 785.11; *see also Donovan v. Williams Chem. Co., Inc.*, 682 F.2d 185, 188-89 (8th Cir. 1982).

The Court determined on Plaintiffs' Motion for Summary Judgment that Ms. Stockdall performed work for which she was not properly compensated. The only issue remaining is to determine how much in wages Ms. Stockdall is owed.

Ms. Stockdall began working at the motel on May 3, 2013. She is seeking wages for hours worked from May 5, 2013, to January 3, 2014, the date Ms. Stockdall was terminated. Ms. Stockdall testified her work day started at 5:00 a.m. when she began making breakfast. Her day ended at 11:00 p.m., when the lobby of the motel closed and she was permitted to return to her lodgings within the motel. Ms. Stockdall is owed wages for forty hours each week she worked during this period. This totals 1,400 hours.[3] Ms. Stockdall's rate of pay is the minimum wage of $7.25 per hour. The total amount of wages Ms. Stockdall should have been paid during this period is $10,150.00. She was paid $894.01. Therefore, Ms. Stockdall is owed $9,255.99 for the hours she worked but was not paid a minimum wage.

### B. Jerry and Cristina Stockdall's Overtime Wages

The FLSA and MMWL require employees be paid one and one-half times the regular rate at which the employee is regularly paid, if the employee works longer than forty hours in a given workweek. 29 U.S.C. § 207(a)(1); Mo. Rev. Stat. § 290.505. As the Court ruled on summary judgment, Mr. Stockdall is not exempted from overtime wages because he does not qualify for

---

[2] Missouri, in enforcing the MMWL, follows regulations issued by the DOL pertaining to the FLSA. 8 C.S.R. § 30-4.010.
[3] Ms. Stockdall worked 40 hours a week for 35 weeks for a total of 1,400 hours.

the executive employee exemption.[4] Therefore, the Court must calculate the amount of overtime wages owed to both Mr. and Ms. Stockdall.

Ms. Stockdall testified she worked from 5:00 a.m. to 11:00 p.m. six days per week. She is also claiming overtime wages for the time she answered phones from 11:00 p.m. to 5:00 a.m. An employee is owed overtime damages for any hours over forty for which she works in a week. During the time period in question, Ms. Stockdall worked from 5:00 a.m. to 11:00 p.m. for eighteen hours per day. For the time Ms. Stockdall claims she occasionally answered the phone from 11:00 p.m. to 5:00 a.m., she will be awarded one hour each night. This makes a total of nineteen hours per day. This amount of hours worked in a day without breaks is unreasonable. The Court reduces Ms. Stockdall's amount of hours worked by one hour each day for bathing and grooming and two hours each day for meals and normal breaks.[5] With these reductions, Ms. Stockdall worked sixteen hours each day. Each week, she worked 96 total hours. Ms. Stockdall is owed overtime wages for 56 hours each week.

Ms. Stockdall's overtime wage is $10.88.[6] Each week Ms. Stockdall worked, she is owed $609.28 in overtime wages.[7] Ms. Stockdall worked this amount of overtime for a total of 34 weeks. She is owed $20,715.52 for this time. In her final week working, Ms. Stockdall worked for five days at her regular schedule, and on her last day, she testified she worked until 2:00 p.m.

---

[4] To qualify for the executive employee exemption, the employee must be one compensated at not less than $455.00 per week, his primary duty must be management, he directs the work of two or more employees, and he has the authority to hire or fire employees or his opinion gives weight to decisions of hiring and firing of employees. 29 C.F.R. § 541.100.

[5] Although Plaintiffs were unable to provide proper records, this is not detrimental to their claim as it is the employer's responsibility to maintain records. *Martin v. Tony & Susan Alamo Found.*, 952 F.2d 1050, 1052 (8th Cir. 1992). When an employer fails to maintain records, the Court may award damages based on the "just and reasonable inference from the evidence presented." *Id.* (citing *Anderson v. Mt. Clemens Potter Co.*, 328 U.S. 680, 687 (1946)).

[6] The overtime wage is calculated by multiplying Ms. Stockdall's regular rate of pay, $7.25, by 1.5 for a total of $10.875.

[7] This amount is calculated by multiplying the total amount of overtime hours, 56, by Ms. Stockdall's overtime rate of $10.88.

For this final week of work, Ms. Stockdall worked five hours answering the phones at night. Including her regular hours and her on-call hours, Ms. Stockdall worked 88 hours.[8] She is owed overtime wages for 48 hours for a total amount of $522.24. For the entire period of time Ms. Stockdall worked for Defendants, from May 5, 2013, to January 3, 2014, Ms. Stockdall is owed $21,237.76 in overtime wages.[9]

Mr. Stockdall is also owed overtime wages for the hours he worked over forty hours each week. Mr. Stockdall testified he began work each day at 3:30 a.m. when he did an outside security check. He stated he retired to his room during normal weeks at 11:00 p.m. each night and during slow weeks at 9:00 p.m. each night. Mr. Stockdall is also seeking overtime wages for his on-call time of 11:00 p.m. to 5:00 a.m. each night. For the time each night he occasionally answered the phone, the Court will allow one hour compensation for each night. The Court will reduce Mr. Stockdall's hours by the same amount as Ms. Stockdall for bathing and grooming, for meals, and normal breaks, a total of three hours each day. Mr. Stockdall is owed overtime wages for 65 hours each week for 17 weeks, and 53 hours each week for the remaining 17 weeks. The Court arrived at this number by calculating half of his nights as "slow" nights, meaning he retired at 9:00 p.m., and half of his nights as "normal," when he retired at 11:00 p.m.[10] Mr. Stockdall testified he was terminated at 2:00 p.m. on January 3, 2014. For his final week of

---

[8] Ms. Stockdall worked five days at her normal hours, sixteen each day, and on her final day, she worked eight hours. On Ms. Stockdall's final day, the Court reduced the total hours by one hour for meals and normal breaks.
[9] The Court does not make a reduction for board and lodging provided by an employer because Defendants do not meet the requirements to receive the reduction. *See* 29 U.S.C. § 203(m); 29 C.F.R. § 531.30-531; 29 C.F.R. § 531.3.
[10] For the period of time with normal nights, Mr. Stockdall worked 20.5 hours per day, reduced by three hours per day for bathing, grooming, meals, and breaks. For the period of time with slow nights, Mr. Stockdall worked 18.5 hours per day, reduced by three hours per day for bathing, grooming, meals, and breaks.

work, he worked 97 hours in total.[11] This results in 57 hours of overtime. The total amount of hours for which Mr. Stockdall is owed overtime wages is 2,063 hours.[12]

Mr. Stockdall's regular pay was $350.00 per week. This is an hourly rate of $8.75. *See* 29 C.F.R. § 778.113. Mr. Stockdall's overtime rate is $13.13.[13] Multiplying the total amount of overtime hours Mr. Stockdall worked, 2,063, by his overtime rate, $13.13, results in the total amount of overtime wages Mr. Stockdall is owed, $27,087.19.[14]

The Court will reduce the damages of both Mr. and Ms. Stockdall for the cost of the rooms they let individuals occupy without paying. Both Mr. and Ms. Stockdall stated they are willing to reduce their damages to pay for these rooms. The Stockdalls let individuals stay in rooms without paying for 122 days. Tina Shedd stayed and her husband stayed for 120 days[15] and a friend of Mr. Stockdall's stayed for two days. This total amount is $7,198.00,[16] which will be applied equally to Mr. and Ms. Stockdall's damages.

C. *Liquidated Damages*

An employer who violates the FLSA is liable to the employee for unpaid wages or overtime and an additional equal amount as liquidated damages. 29 U.S.C. § 216(b). The Court may determine liquidated damages should not be awarded when an employer proves it acted in good faith and had reasonable grounds for believing its actions were not a violation of FLSA. 29 U.S.C. § 260. The employer bears the burden of proving he has acted in good faith and had

---

[11] Mr. Stockdall worked five days at his normal hours, 17.5 per day, and 9.5 hours on the final day. The Court reduced the total hours on Mr. Stockdall's final day by one hour for meals and normal breaks.
[12] This includes 65 hours of overtime for seventeen weeks for his "normal" weeks, 53 hours of overtime for seventeen weeks for his "slow" weeks, and 57 hours of overtime for his final week.
[13] Mr. Stockdall's overtime rate is calculated by multiplying his regular hourly rate, $8.75, by 1.5, resulting in $13.125.
[14] The Court does not make a reduction for board and lodging provided by an employer because Defendants do not meet the requirements to receive the reduction. *See* 29 U.S.C. § 203(m); 29 C.F.R. § 531.30-531; 29 C.F.R. § 531.3.
[15] Ms. Stockdall testified Tina Shedd stayed for 120 days while Mr. Stockdall testified she stayed for 90 days. The Court credits the testimony of Ms. Stockdall and will use 120 days to calculate the reduction in damages.
[16] This was calculated by multiplying 122 days by $59.00 per day.

reasonable grounds but the burden is high because single damages are the exception. *Chao v. BBQ Ventures, LLC*, 547 F.3d 938, 941-42 (8th Cir. 2008). Good faith means an honest intention to ascertain and follow the dictates of the FLSA. *Id.* at 942. The employer must have taken affirmative steps to learn the requirements of the act and the employer's position must be objectionably reasonable. *Id*.

A judgment should result in a fair disposition of the parties' lawsuit based upon the evidence in the case. The judgment this Court is entering is not the judgment that should be entered if the law permitted fair disposition of the issues in this case. Plaintiffs gave to their family and friends room services at the motel, never informing Mr. Shipman of these transactions. Plaintiffs were fired when Mr. Shipman learned Plaintiffs were giving free guest services to motel guests. Mr. Stockdall recognized these transactions were unlawful when he told Mr. Shipman he would make things right. He also went to the police to advise of his defalcation. Only because the Court is forced to do so under the law are liquidated damages being awarded. The Court should have the ability to deny liquidated damages under facts and circumstances when allowing such damages results in unjust enrichment and rewards bad behavior. The Court is constrained to an unjust result in this case.

On Plaintiffs' Motion for Summary Judgment, the Court determined Plaintiffs were entitled to liquidated damages as Defendants did not prove they acted in good faith and had reasonable grounds for believing their actions were not a violation of the FLSA. Liquidated damages are an equal amount of unpaid wages and overtime wages. 29 U.S.C. § 216(b). Ms. Stockdall's damages are $26,894.75.[17] Including liquidated damages, the total amount of

---

[17] This amount includes $9,255.99 for Ms. Stockdall's unpaid wages and $21,237.76 for Ms. Stockdall's overtime wages and reduction of $3,599.00 for the unpaid rooms.

damages owed to Ms. Stockdall is $53,789.50. Mr. Stockdall's damages for unpaid overtime wages are $23,488.19.[18] Including liquidated damages, Mr. Stockdall's total damages are $46,976.38.

   D.   *FLSA Retaliation*

The FLSA prohibits employers from discharging or discriminating against an employee because the employee has filed a complaint or instituted proceedings related to the FLSA. 29 U.S.C. § 215(a)(3). A plaintiff pursing a retaliation claim must show "(1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010); *see also Shrable v. Eaton Corp.*, 695 F.3d 768, 771 (8th Cir. 2012). An employment action is adverse if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

On Defendant TGI's Motion for Summary Judgment, the Court determined Defendant's counterclaim may form the basis of a claim for FLSA retaliation. The Court did not grant judgment for Plaintiffs as to their FLSA retaliation claim. No evidence was presented at trial to support Plaintiffs' claim. Therefore, the Court grants judgment for Defendants on Count V on Plaintiffs' Amended Complaint.

Accordingly,

**IT IS HEREBY ORDERED** that that Plaintiffs Jerry and Cristina Stockdall shall have judgment against Defendants TG Investments, Inc. and George Shipman and shall be awarded

---

[18] This amount was calculated by reducing Mr. Stockdall's overtime wages, $27,087.19, by $3,599.00 for unpaid rooms.

damages in the amount of $53,889.50 to Cristina Stockdall and $46,976.38 to Jerry Stockdall for unpaid wages and liquidated damages.

**IT IS FURTHER ORDERED** that Count V of Plaintiffs' Amended Complaint, ECF No. 13, shall be **DISMISSED, with prejudice**.

An Order of Judgment will be issued together with this Memorandum and Order.

So Ordered this 14th Day of April, 2016.

                                                *E. Richard Webber* (signature)

_____
**E. RICHARD WEBBER**
**SENIOR UNITED STATES DISTRICT JUDGE**